[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-17062

_____

D.C. Docket No. 08-20473-CR-MGC

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 25, 2010
JOHN LEY
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RICHARD LEE ALEXANDER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 25, 2010)

Before TJOFLAT and COX, Circuit Judges, and KORMAN,[*] District Judge.

COX, Circuit Judge:

Richard Lee Alexander appeals the sentence imposed following his guilty plea

to a charge of being a felon in possession of a firearm. The district court added a

_____

[*]Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

career offender enhancement to Alexander's sentence because it held that his prior felony conviction under Fla. Stat. § 790.15(2) for discharging a firearm from a vehicle within 1,000 feet of another person qualified as a crime of violence under the United States Sentencing Guidelines. Alexander contends that the enhancement was improper. Applying the framework announced by the Supreme Court in *Begay v. United States*, 553 U.S. 137, 128 S. Ct. 1581 (2008), we conclude that a conviction under Fla. Stat. § 790.15(2) involves conduct that is "similar in kind and degree of risk posed" to burglary, arson, extortion, and crimes involving the use of explosives—the crimes enumerated in the Guidelines' definition of crime of violence. U.S.S.G. § 4B1.2(a). Therefore, we hold that Alexander's conviction qualifies as a crime of violence.

Alexander also contends that the court erred by failing to award credit against his sentence for time that he served in state custody. We conclude that the district court did not have authority to award credit for time served in state custody. Accordingly, we affirm.

## I. Background & Procedural History

On February 4, 2008, Alexander was arrested by Miami Gardens police officers and was charged, under Florida law, for possession of narcotics and possession of a firearm by a convicted felon. He was detained at the Miami-Dade County Jail. On

2

May 30, 2008, he was indicted on federal charges stemming from the same incident. A three-count indictment alleged a violation of 18 U.S.C. § 922(g)(1) for possession of a firearm by a convicted felon, a violation of 21 U.S.C. § 844(a) for possession of cocaine, and a violation of section 844(a) for possession of marijuana. On June 13, 2008, he was transferred from state custody to federal custody, and the Florida charges were dismissed.

Alexander pleaded guilty to possession of a firearm by a convicted felon, count one of the federal indictment. Pursuant to a plea agreement, the Government dismissed counts two and three, the drug charges. The United States Probation Office then produced a Presentence Investigation Report ("PSI"). Alexander had previously been convicted of discharging a firearm from a vehicle within 1,000 feet of another person in violation of Fla. Stat. § 790.15(2). The PSI factored this conviction as a "crime of violence" for purposes of U.S.S.G. § 2K2.1(a)(4)(A), which increased the recommended base offense level from fourteen to twenty.

Alexander filed an objection to the PSI; he argued that the prior conviction under Fla. Stat. § 790.15(2) did not qualify as a crime of violence in light of *Begay* because it was not "purposeful, violent, and aggressive" behavior. 553 U.S. at __, 128 S. Ct. at 1586. At the sentencing hearing, Alexander reasserted that his prior conviction should not be categorized as a crime of violence, but the district court

disagreed. Reasoning that an enhancement is appropriate where a prior offense involved behavior that could "result in a serious potential risk of physical injury to another," the court held that a conviction under Fla. Stat. § 790.15(2) qualifies as a crime of violence and that the PSI properly set Alexander's base offense level at twenty. (R.2-40 at 8-9.) After a three-level adjustment for acceptance of responsibility, the court determined that Alexander's Guidelines offense level was seventeen, that his criminal history category was IV, and that the advisory Guidelines range was thirty-seven to forty-six months. The court considered the relevant sentencing factors and imposed a sentence of forty-three months imprisonment to be followed by a term of three-years supervised release. Alexander then requested that the court grant credit against or modify his sentence to account for the time he spent in state custody from the date of his arrest to the date he was transferred to federal custody. The court declined to do so. Alexander appeals.

## II. Issues on Appeal & Contentions of the Parties

We first consider whether a conviction under Fla. Stat. § 790.15(2) for willfully discharging a firearm from a vehicle within 1,000 feet of another person qualifies as a crime of violence as defined by U.S.S.G. § 4B1.2(a) and the Supreme Court's opinion in *Begay*. Alexander argues that, applying the framework set forth in *Begay*, his prior conviction does not qualify as a crime of violence because a violation of Fla.

4

Stat. § 790.15(2) does not present a serious risk of injury to another and is not similar in kind as well as in degree of risk posed to the crimes listed as examples in § 4B1.2(a)(2)—burglary, arson, extortion, and crimes involving the use of explosives. The Government counters that the district court properly classified Alexander's prior conviction as a crime of violence because willfully discharging a firearm is inherently violent and aggressive and because the crime poses a greater potential risk of physical injury to another than many other offenses held to be crimes of violence.

Alexander also argues that he is entitled to credit against his sentence for the time that he spent in state custody based on the incident that ultimately led to his conviction in this case. He argues that under 18 U.S.C. § 3585(b), a defendant is entitled to credit for any time he has spent in official detention prior to the date of sentencing. The Government counters that the legal authority to calculate credit for time served under 18 U.S.C. § 3585(b) is vested in the Attorney General. And, exhaustion of administrative remedies is a jurisdictional prerequisite to any action challenging the calculation of time-served credit. Because Alexander does not allege that he exhausted his administrative remedies, the Government argues, the district court properly declined to award credit for time served in state custody.

## III. Standard of Review

We consider de novo a district court's interpretation of the Sentencing Guidelines and the application of law to sentencing issues. *United States v. Llanos-Agostadero*, 486 F.3d 1194, 1196 (11th Cir. 2007).

## IV. Discussion

A. *Crime of Violence*

The Sentencing Guidelines provide for a base offense level of fourteen for a violation of 18 U.S.C. § 922(g)(1), possession of a firearm by a convicted felon. U.S.S.G. § 2K2.1(a)(6). The base offense level is increased to twenty if the defendant has a prior conviction for a crime of violence. *Id.* § 2K2.1(a)(4)(A). This increases the advisory sentencing range for a defendant with a category IV criminal history, like Alexander, from 27-33 months imprisonment to 51-63 months imprisonment. *Id.* Ch. 5, Pt. A. The Guidelines define "crime of violence" as

> any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that –(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

U.S.S.G. § 4B1.2(a). The Government concedes that the crime in this case, discharging a firearm from a vehicle within 1,000 feet of another person, does not fall

under subsection one of this definition, and we agree. And, the crime is not one of those enumerated in subsection two. At issue is whether this offense falls within the residual provision of subsection two—whether it "otherwise involves conduct that presents a serious potential risk of physical injury to another." *Id.* § 4B1.2(a)(2).

In *Begay*, *James v. United States*, 550 U.S. 192, 127 S. Ct. 1586 (2007), and *Chambers v. United States*, __ U.S. __, 129 S. Ct. 687 (2009), the Supreme Court analyzed the definition of "violent felony" under the Armed Career Criminal Act ("ACCA"). 18 U.S.C. § 924(e)(2)(B)(i)-(ii). Considering whether a crime is a "violent felony" under the ACCA is similar to considering whether a conviction qualifies as a "crime of violence" under U.S.S.G. § 4B1.2(a) because "the definitions for both terms are virtually identical." *United States v. Taylor*, 489 F.3d 1112, 1113 (11th Cir. 2007) (quotation and citation omitted). The definitions provide the same example offenses: burglary, arson, extortion, and crimes involving the use of explosives. And, the residual clauses are identical; they classify as violent any felony that "otherwise involves conduct that presents a potential risk of physical injury to another." *Compare* 18 U.S.C. § 924(e)(2)(B)(ii) (defining "violent felony"), *with* U.S.S.G. § 4B1.2(a)(2) (defining "crime of violence"). Accordingly, we look to the Supreme Court's opinions applying the ACCA, including *Begay*, *James*, and *Chambers*, for guidance in considering whether an offense qualifies as a crime of

7

violence under the Sentencing Guidelines. *See United States v. Harris*, 586 F.3d 1283, 1285 (11th Cir. 2009).

The first step of the "crime of violence" analysis is to identify the specific crime at issue. In *James*, the Supreme Court instructed that courts should apply a "categorical approach" to this step of the analysis. 550 U.S. at 202, 127 S. Ct. at 1593-94. Under this approach, we "look only to the fact of conviction and the statutory definition of the prior offense, and do not generally consider the particularized facts disclosed by the record of conviction." *Id.* 550 U.S. at 202, 127 S. Ct. at 1594 (citation and quotation omitted). We "consider whether the elements of the offense are of the type that would justify its inclusion within the residual provision, without inquiring into the specific conduct of this particular offender." *Id.* (emphasis omitted). In other words, we look to the way the crime is committed in the "ordinary case" or the "generic sense"; we do not examine the facts that gave rise to a particular conviction. *See Begay*, 553 U.S. at __,128 S. Ct. at 1584. When we consider crimes under the residual provision,[1] "we pay attention to the way that the state statutory scheme identifies the relevant crime. Although we look at the crime

---

[1]"[T]he categorical approach changes slightly when a court analyzes a state crime under the residual clause, as is the case here, as opposed to a state crime enumerated" in 18 U.S.C. § 924(e)(2)(B)(ii) or U.S.S.G. § 4B1.2(a)(2). *Harrison*, 558 F.3d at 1285. When considering an enumerated crime, courts define the crime in its generic sense, "regardless of its exact definition or label," because courts seek to ensure a consistent definition of a word that Congress selected. *Id.* (quoting *Taylor v. United States*, 495 U.S. 575, 599, 110 S. Ct. 2143, 2158 (1990)).

as it is 'ordinarily committed,' we focus on the elements of the state crime to determine the way in which it is ordinarily committed." *United States v. Harrison*, 558 F.3d 1280, 1285 (11th Cir. 2009) (explaining that the Supreme court, in *James*, *Begay*, and *Chambers*, looked to the particular state statutes to supply the elements of the relevant crime).

After identifying how the crime is "ordinarily committed," we then address whether it is a "crime of violence." Prior to *Begay*, courts considered only whether a crime posed a serious potential risk of physical injury, comparable to the risk posed by the enumerated crimes. If so, it qualified as a crime of violence. For example, in *James*, the Court assessed the risk of injury posed by an attempted burglary. Because the crime presented a serious risk of violent confrontation between a would-be burglar and an innocent person, the Court concluded that the risk was comparable to a completed burglary, and it held that attempted burglary qualifies as a "violent felony" under the ACCA. *James*, 550 U.S. at 203-04, 127 S. Ct. at 1594-95.

In *Begay*, the Court enhanced the test for considering whether an offense is a "violent felony" under the residual provision of the ACCA. The Court explained that the purpose of the ACCA is to punish those whose prior conduct demonstrates "a likelihood of future violent, aggressive, and purposeful 'armed career criminal' behavior . . . ." 553 U.S. at __, 128 S. Ct. at 1588. And, a prior conviction for crimes

9

such as burglary and arson would "show an increased likelihood that the offender [who later possesses a firearm] is the kind of person who might deliberately point the gun and pull the trigger." *Id.* 553 U.S. at __, 128 S. Ct. at 1587. Therefore, the Court concluded, a crime must pose a serious potential risk of physical injury to qualify as a violent felony, but this alone is insufficient. The Court held that a crime must be "roughly similar, in kind as well as in degree of risk posed," to the crimes enumerated in the statute: burglary, arson, extortion, and crimes involving the use of explosives. *Id.* 553 U.S. at __, 128 S. Ct. at 1585.

*Begay* considered whether a conviction for driving under the influence of alcohol was a "violent felony." 553 U.S. at __, 128 S. Ct. at 1584. The Court assumed that DUI involved conduct that presents a serious potential risk of physical injury to another, but it held that the offense differed from the enumerated crimes. *Id.* It reasoned that the listed crimes "all typically involve purposeful, 'violent,' and 'aggressive' conduct," whereas DUI is a crime of strict liability. *Id.* 553 U.S. at __, 128 S. Ct. at 1586. It added that for purposes of the ACCA, a prior record of DUI "differs from a prior record of violent and aggressive crimes committed intentionally," *id.* 553 U.S. __, 128 S. Ct. at 1588, and "is simply too unlike the provision's listed examples for us to believe that Congress intended the provision to cover it." *Id.* 553 U.S. at __, 128 S. Ct. at 1584.

10

In *Chambers*, the Court offered additional insight which guides the "violent felony" analysis under the ACCA and the "crime of violence" analysis under the Sentencing Guidelines. *Chambers* held that a conviction for knowingly failing to report to a penal institution was not a violent felony under the ACCA. __ U.S. at __, 129 S. Ct. at 693. It observed that failing to report "amounts to a form of inaction, a far cry from the 'purposeful, "violent," and "aggressive" conduct' potentially at issue when an offender uses explosives against property, commits arson, burgles a dwelling or residence, or engages in certain forms of extortion." __U.S. __, 129 S. Ct. 687, 691 (2009) (quoting *Begay*, 553 U.S. at __, 128 S. Ct. at 1586). In *Chambers*, the Court looked to statistical data to assess the risk posed by a failure to report. It relied, in part, on a United States Sentencing Commission Report that examined cases involving escapes over a two year period. *Id.* __ U.S. at __, 129 S. Ct. at 692. The Court interpreted the report, which identified few instances of escapes leading to violent confrontations, to "strongly support the intuitive belief that failure to report does not involve a serious potential risk of physical injury." *Id.* __ U.S. __, 129 S. Ct. at 692. We have since read *Chambers* to suggest "that statistical evidence plays a role in assessing the risk of non-enumerated crimes under the residual clause." *Harrison*, 558 F.3d at 1289.

11

In *Harrison*, a case in which we applied *James*, *Begay*, and *Chambers* to hold that a Florida conviction for willfully fleeing a police officer in a motor vehicle was not a violent felony, we held that *James* and *Begay* established a three-step test:

> First, what is the relevant category of crime, determined by looking to how the crime is ordinarily committed? Second, does that crime pose a "serious potential risk of physical injury" that is similar in degree to the risks posed by the enumerated crimes? Third, is that crime similar in kind to the enumerated crimes?

*Id.* at 1287. After applying this test, we concluded that fleeing from a police officer in a motor vehicle is not "sufficiently aggressive and violent enough to be like the enumerated ACCA crimes." *Id.* at 1295. We explained that the fleeing crime "seems more appropriately characterized as the crime of a fleeing coward—not an armed career criminal bent on inflicting physical injury." *Id.* at 1296. We added, "such conduct does not 'show an increased likelihood that the offender is the kind of person who might deliberately point the gun and pull the trigger.'" *Id.* (quoting *Begay*, 553 U.S. at __, 128 S. Ct. at 1587). We also suggested, however, that "our conclusion would be different were the statute to criminalize conduct that, in the ordinary case, involves an offender stepping on the gas and driving away recklessly without regard for the safety of others." *Id.* at 1295.

In *Harris*, we addressed a conviction under a separate section of the same Florida statute, a provision that proscribed fleeing a police officer in a motor vehicle

*at a high speed* or with a *wanton disregard for the safety of persons or property.* 586 F.3d at 1284. We applied the three-step analysis set forth in *Harrison* and concluded that this offense qualifies as a crime of violence under the Sentencing Guidelines. *Id.* at 1289. We reasoned that fleeing *at a high speed* or with *wanton disregard for the safety of persons or property* demonstrates a "degree of callousness toward risk," *id.* at 1288 (citation omitted), and "more closely resembles the characteristics of a burglar committing a crime, aware that violence might ensue, or of an arsonist using a fire as a weapon, even without the intent of burning someone." *Id.* at 1287-88. Accordingly, we distinguished this offense from merely fleeing from police, the crime at issue in *Harrison*, and concluded that it was "similar in kind and degree" to the enumerated crimes. *Id.* at 1288.

We address whether a conviction under Fla. Stat. § 790.15(2) qualifies as a crime of violence under the Sentencing Guidelines with the benefit of the Supreme Court's opinions in *James*, *Begay*, and *Chambers*, and our opinions in *Harrison* and *Harris*. We hold that it does.

We begin by applying the "categorical approach" to identify how the crime is committed in the ordinary case. "We read the face of [the statute] itself to discern the crime as it is ordinarily committed." *Harris*, 586 F.3d at 1288. The statute is titled "Discharging Firearm in Public." Section two, which we consider here, reads "[a]ny

13

occupant of any vehicle who knowingly and willfully discharges any firearm from the vehicle within 1000 feet of any person commits a felony of the second degree . . . ." Fla. Stat. § 790.15(2). The Florida Supreme Court has stated that "[s]hooting from a vehicle in violation of section 790.15(2) requires proof of two elements: (1) the defendant knowingly and willfully discharged a firearm from a vehicle; and (2) the discharge occurred within 1,000 feet of any person." *Valdes v. State*, 3 So. 3d 1067, 1071 (Fla. 2009). So, to violate the statute, a person must deliberately fire a weapon from a vehicle, but the person need not aim the weapon at another person or thing. And, while another person must be within 1,000 feet, the shooter need not be aware of his or her presence. One Florida court, in addressing whether double jeopardy concerns were presented by dual convictions under this section and another Florida statute proscribing the shooting into a building or vehicle, explained that the "primary evil" targeted by section 790.15(2) "is the potential for someone in the public domain to be injured or killed without any malice or intent to inflict bodily harm." *Valdes v. State*, 970 So. 2d 414, 420 (Fla. 3d DCA 2007). The court went so far as to add that "section 790.15 punishes firing a gun into the air with no evil intent and seeks to prevent even innocent revelers celebrating the new year from discharging a gun in public." *Id.* at 421.

The bare elements of the offense, with the benefit of these statements by the Florida courts interpreting the crime in a different context, drive our assessment of how section 790.15(2) is violated "in the ordinary case." However, we also compare the offense at issue with other provisions of section 790.15 to add context and to better understand the Florida courts' interpretations of the provision. *See Harrison*, 558 F.3d at 1293 (noting the court's categorization of fleeing offenses reflected the Florida legislature's decision to differentiate between different types of fleeing behavior). Section one of the statute proscribes knowingly discharging a firearm in a public place. Fla. Stat. § 790.15(1). This crime is classified as a misdemeanor of the first degree and is punishable by up to one-year imprisonment. Fla. Stat. § 775.082(4)(a). Section two of the statute adds the elements of (1) firing from a vehicle; and (2) doing so within 1,000 feet of another person. This offense is a class-two felony and is punishable by up to fifteen-years imprisonment. Fla. Stat. § 775.082(3)(c). The categorization of these offenses—class-one misdemeanor as opposed to class-two felony—as well as the variation in maximum penalties—one-year imprisonment as opposed to fifteen-years imprisonment—classifies this offense as substantially more serious than merely discharging a firearm in a public place. While section 790.15 may indeed "seek[] to prevent even innocent revelers celebrating the new year from discharging a gun in public," we suspect that section

15

790.15(2) intends to target more egregious conduct. We do not identify the crime at issue based on our suspicions of the intent of the Florida legislature; rather, we rely on the elements of the offense. Nevertheless, the fact that Florida law classifies discharging a firearm from a vehicle within 1,000 feet of another as more reprehensible than merely discharging a firearm in public aids us in evaluating the nature of that conduct.

Having determined how the crime is ordinarily committed, we address whether it poses a "serious potential risk of physical injury to another." The Supreme Court, in assessing the risk of crimes under the residual provision, has used statistical evidence to guide its analysis. *See Harrison*, 558 F.3d at 1289-90 (describing the use of statistics in *James*, *Begay*, and *Chambers* to assess risk). Here, we are without the benefit of empirical evidence, so we are left to rely on our own common-sense analysis of whether this conduct poses a serious potential risk of physical injury. *Id.* at 1295 n.26 (noting that empirical evidence is not required to assess risk). We conclude that it does.

The firing of a weapon poses a risk that a bystander will be injured by a stray bullet. The range of even a small handgun exceeds the range of sight of the person firing the gun. Even if the shooter aims the weapon at an appropriate target, and even if the shooter discharges the weapon in an area he or she believes is free of

16

bystanders, there is a risk that the bullet will stray from its target and injure another person. This risk increases substantially when the firearm is discharged from a vehicle. Not only is the shooter's range of vision diminished, but vehicles are commonly located on roads and parking areas, which are often adjacent to inhabited buildings and populated by drivers of other vehicles, their passengers, and pedestrians. Adding to this the element that another individual must be within 1,000 feet further increases the likelihood that section 790.15(2) is violated under circumstances in which there is a strong chance that, intentionally or not, some other person will be struck by a bullet. Of course, as is the case with most crimes, we could contemplate a scenario in which section 790.15(2) could be violated without posing a serious risk of injury to another. But, we assess the risk of injury generally, not by imagining scenarios in which the offense could be committed safely. *See James*, 550 U.S. at 207, 127 S. Ct. at 1597 (2007) (explaining that the residual provision "speaks in terms of a 'potential risk'" and does not require "metaphysical certainty" that commission of a crime will pose a risk of injury). We conclude that, as the crime is generally committed, it poses a serious potential risk of physical injury to another at least similar to the risk posed by the crimes enumerated in U.S.S.G. § 4B1.2(a)(2).

We turn now to whether a violation of section 790.15(2) is "roughly similar in kind" to the enumerated offenses—burglary, arson, extortion, and crimes involving

17

the use of explosives. In *Begay*, the Supreme Court explained that these crimes typically involve "purposeful, violent, and aggressive" conduct. 553 U.S. at __, 128 S. Ct. at 1586. Some courts have interpreted this language to mean that an offense is a crime of violence only if it includes, as an element of the offense, an intent to cause harm. *See, e.g.*, *United States v. Woods*, 576 F.3d 400, 412-13 (7th Cir. 2009) ("[T]he residual clause encompasses only purposeful crimes; crimes with the *mens rea* of recklessness do not fall within its scope"); *United States v. Herrick*, 545 F.3d 53, 56-57 (1st Cir. 2008) (holding homicide by negligent operation of a vehicle not a crime of violence). Section 790.15(2) may be violated absent any intent to harm persons or property. So, if we were to read *Begay* to demand a specific intent to harm, we must conclude that a conviction under section 790.15(2) does not qualify as a crime of violence.

But we have never equated "purposeful, violent, and aggressive" with a specific intent to harm. Instead, we suggested in *Harrison* that a purposeful act demonstrating a "callousness and indifference to the lives of others smack[s] . . . of the kind of person that might 'deliberately point the gun and pull the trigger'" and would be similar in kind to the enumerated offenses. 558 F.3d at 1295 (quoting *Begay*, 553 U.S. at __, 128 S. Ct. at 1587) (suggesting that a statute proscribing fleeing the police "recklessly without regard for the safety of others" would qualify

18

as a violent felony under the ACCA).  And, in *Harris* we held that a crime was "purposeful, violent, and aggressive" where the offense "evince[d], by the very language of the statute, a palpable risk of serious injury to persons or property, if not death." 586 F.3d at 1288.  In *Harris*, we explained that willfully fleeing from the police at high speed or with a wanton disregard for the safety of others was "undeniably purposeful," it was "violent" because the offender "poses a powerful risk to the arresting officer, pedestrians, and other drivers and passengers in their cars," and "aggressive" because "a driver fleeing at such high speeds is indeed like holding a weapon out, ready to fire." *Id.*

Knowingly and willfully discharging a firearm from a vehicle is, without question, "purposeful" conduct.  Unlike the DUI at issue in *Begay*, section 790.15(2) is not a strict liability provision.  The *Begay* Court explained that "a drunk driver may very well drink on purpose.  But . . .  unlike the example crimes, the conduct for which the drunk driver is convicted (driving under the influence) need not be purposeful or deliberate." 553 U.S. at __, 128 S. Ct. at 1587.  In contrast, the conduct for which a person is convicted under section 790.15(2) is the purposeful firing of a weapon from a vehicle.  The additional element that another person must be within 1,000 feet limits the circumstances under which this purposeful act violates the

19

statute. It does not, however, transform this provision from a purposeful crime to a crime of strict liability.

Not only is it purposeful, but a violation of section 790.15(2) also typically involves "violent" and "aggressive" conduct. Often, the consequence of discharging a firearm is the death or injury of a person or animal, or the destruction of property. More often than not, it is a violent and aggressive act. There are, of course, lawful, non-violent, and non-aggressive means to discharge a firearm, such as recreational shooting at a designated range. And, we suspect that there are even some unlawful, yet non-violent and non-aggressive means to discharge a firearm. But, it would be an exceptional case for one to fire from a vehicle within 1,000 feet of another person without violence and aggression. Under these circumstances, the shooter knows or should know of the potential risk of injury he or she creates by firing the weapon. The shooter knowingly, or recklessly without regard for the safety of others, puts drivers of other vehicles, their passengers, pedestrians, and inhabitants of nearby buildings at risk of serious injury or death. Like the burglar who breaks and enters a home in disregard of the risk of violent confrontation, or the arsonist who sets fire to a structure in disregard of the undeniable risk to its occupants, a person who discharges a firearm from a vehicle performs a deliberate act that poses an obvious

risk of injury or death to innocent third parties. This is, we believe, "violent" and "aggressive" conduct.

We acknowledge that section 790.15(2) could technically be violated in a case where the shooter does not knowingly or recklessly put others at risk of injury or death—for example, the firing of a weapon into the air from a vehicle in a secluded area. But, *Begay* instructs us to examine whether the crime in question *typically* involves purposeful, violent, and aggressive conduct. 553 U.S. at __, 128 S. Ct. at 1586; *see also United States v. Zuniga*, 553 F.3d 1330, 1334-35 (10th Cir. 2009) (holding that possessing a deadly weapon in a penal institution is purposeful because, although it can be committed recklessly, it is typically committed intentionally). We are without the benefit of empirical data to verify that the commission of this offense typically involves violent and aggressive conduct. But, our conclusion that it does is supported by a review of the facts of Florida cases discussing section 790.15(2) and the inferences we draw from the way Florida law classifies this offense. The facts of every reported case discussing section 790.15(2) of which we are aware relate conduct that is, undeniably, violent and aggressive. *Valdes*, 3 So. 3d at 1068 (intentional discharge of a firearm into an occupied vehicle); *Lopez-Vazquez v. State*, 931 So. 2d 231, 235 (Fla. 5th DCA 2006) (same); *Luciano v. State*, 12 So. 3d 917, 918 (Fla. 5th DCA 2009) (same); *Lamb v. State*, 668 So.2d 666, 666 (Fla. 2d DCA

1996) (discharging a firearm from a vehicle at a police officer); *Hall v. State*, 661 So. 2d 63, 63 (Fla. 2d DCA 1995) (guilty plea to attempted murder and discharging a firearm from a vehicle). And, as we explained above, Florida law classifies a violation of section 790.15(2) as a class-two felony, whereas it classifies discharging a firearm in public as a misdemeanor. This distinction suggests that this provision targets violent and aggressive conduct, not the mere careless use of a firearm. While we do not base our conclusions solely on the classification of this offense and the facts of Florida cases discussing it, we note that they support our inference that a violation of 790.15(2) *typically* involves violent, purposeful, and aggressive conduct, the kind which "makes more likely that an offender, later possessing a gun, will use that gun deliberately to harm a victim." *Begay*, 553 U.S. at __, 128 S. Ct. at 1586.

In *Harris*, we equated "[f]leeing at high speed or with wanton disregard for safety" to "holding a finger on the trigger of a deadly weapon, without care for whom the bullet may strike," 586 F.3d at 1289—precisely the conduct that is targeted by Fla. Stat. § 790.15(2). Like we did in *Harris*, we conclude that, as this crime is typically committed, it presents a serious potential risk of physical injury to another and is similar in kind to burglary, arson, extortion, and crimes involving the use of explosives, the crimes enumerated in U.S.S.G. § 4B1.2.

22

We hold that for purposes of U.S.S.G. § 2K2.1(a)(4)(A), a court should factor a prior conviction under Fla. Stat. § 790.15(2) as a crime of violence.

B. *Credit for Time Served in State Custody*

Alexander also argues that the district court erred by declining to award credit against his sentence for time served in state custody. 18 U.S.C. § 3585(b) provides, "[a] defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences . . . ." Authority to calculate credit for time served under section 3585(b) is vested in the Attorney General, not the sentencing court. *United States v. Wilson*, 503 U.S. 329, 334, 112 S. Ct. 1351, 1354 (1992). And, prisoners may seek judicial review of the calculation only after exhausting administrative remedies. *United States v. Lucas*, 898 F.2d 1554, 1555 (11th Cir. 1990).

At the sentencing hearing, Alexander requested that the court modify his sentence to take into account the fact that the Bureau of Prisons would not give him credit for the time he served in state custody. (R.2-40 at 15.) On appeal, he re-characterizes this as a request for credit against his sentence pursuant to 18 U.S.C. § 3585(b). We need not be detained by concerns as to whether this issue was preserved for review, however, because Alexander has not exhausted his administrative remedies, and thus the district court lacked authority to award credit for time served.

## V. Conclusion

For the reasons stated above, we AFFIRM Alexander's sentence of forty three-months imprisonment to be followed by three years supervised release for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g).

AFFIRMED.