MARTIN, Circuit Judge,
with whom JILL PRYOR, Circuit Judge, joins,
concurring in result:
Six years ago Charles Clayton was sentenced to 30 years in prison for possessing a kilogram of cocaine with intent to distribute. The criminal law he violated required a sentence of at least 10 years. But beyond the statute, Mr. Clayton faced the United States Sentencing Guidelines, which call for longer prison sentences for defendants who had been convicted of certain crimes earlier in their lives. Specifically, Mr. Clayton was sentenced based on a guideline that sets a longer sentence for defendants whose earlier crime “involves conduct that presents a serious potential risk of physical injury to another.” USSG § 4B1.2(a)(2). After Mr. Clayton was sentenced in 2010, the Supreme Court told us that these identical 13 words in the Armed Career Criminal Act (ACCA) are so vague as to violate the Due Process Clause of our Constitution. See Johnson v. United States, — U.S. -, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015).
Since Johnson was decided, prisoners sentenced based on these words in the Sentencing Guidelines have come into federal courts seeking the same relief Johnson has given to prisoners sentenced based on the same words in the statute. Every other court of appeals has either held or assumed that Johnson makes the language in § 4B1.2(a)(2) of the Sentencing Guidelines unconstitutional.[1] Our court alone has held otherwise. See United States v. Matchett, 802 F.3d 1185 (11th Cir. 2015). Over nine months ago Mr. Matchett asked this court to rehear his case, but we have yet to rule on his petition for rehearing. Because no ruling has issued on his petition and because the Supreme Court has now granted certiorari in a case that will evaluate this court’s ruling in Matchett,[2] I *1257 will write in Mr. Clayton’s case to highlight the problems Matchett has caused people like him since it issued on September 21, 2015.
While I’m at it, Mr. Clayton’s case also gives an opportunity to describe other ways our court has limited the reach of Johnson for people who may be serving unlawful sentences imposed in the federal courts of Alabama, Florida, and Georgia. Generally a person who finds himself serving an illegal sentence can seek relief by filing what is known as a § 2255 motion. Mr. Clayton filed a § 2255 motion in 2013. The statute governing § 2255 motions, the Antiterrorism' and Effective Death Penalty Act of 1996 (AED-PA), restricts a prisoner’s ability to file more than once. Specifically, AEDPA allows a prisoner who already filed one § 2255 motion to file another (what the statute refers to as a “second or successive” motion) only if he first applies for and gets permission from the court of appeals. Mr. Clayton filed one of these applications. When courts of appeals get these applications AEDPA directs us to “certify]” whether the applicant made “a pri-ma facie showing” that his § 2255 motion will “contain ... a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court.” 28 U.S.C. §§ 2244(b)(3)(C), 2255(h). In the last couple of months, this court has received hundreds of these applications from prisoners who want relief based on the Supreme Court’s ruling in Johnson.
In deciding these applications, we have been doing far more than what the statute directs. The judges of this court, myself included, have been combing through sealed records from the prisoner’s original sentence hearing and going ahead to make a decision about whether the prisoner will win if we let him file his § 2255 motion in district court. We are making these decisions “without briefing or argument from a lawyer.” In re McCall, 826 F.3d 1308, 1311, 2016 WL 3382006, at *2 (11th Cir. June 17, 2016) (Martin, J.,' concurring). Most troubling of all, none of these decisions can be appealed, even if it turns out we decided wrong. See 28 U.S.C. § 2244(b)(3)(E).
I.
I first address this court’s Matchett ruling, which has had the effect of locking prisoners into harsh sentences that I understand every other circuit to be reexamining. Matchett affects a lot of people. In fiscal year 2014 alone, 2,269 people in this country were sentenced using USSG § 4B1.1, known as the “career offender” guideline.[3] No matter how short a sentence the guidelines might otherwise call for a defendant to get, if he is designated as a career offender then he is placed in the worst class of offenders and the judge is expected to impose the maximum sentence. See United States v. LaBonte, 520 U.S. 751, 754, 117 S.Ct. 1673, 1675, 137 L.Ed.2d 1001 (1997) (“Pursuant to that Guideline, each defendant who qualifies for career offender status is automatically placed in criminal history ‘Category VI,’ the highest available under the Guidelines.”). To be clear, this drastic increase is required by statute. See 28 U.S.C. § 994(h) (“The Commission shall assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum *1258 term authorized for categories of defendants ... convicted of two or more prior felonies, each of which is ... a crime of violence.”).
The guidelines define the term “crime of violence” from 28 U.S.C. § 994(h) in three ways, one of which uses the 13 words the Supreme Court ruled unconstitutional in Johnson. See USSG §4B1.2. The term “crime of violence” is also used in several other places in the Sentencing Guidelines, so these 18 words can trigger higher sentences by way of those provisions as well. See, e.g., id. § 2K1.3 (the guidelines section for crimes involving explosives); id. § 2K2.1 (the section for firearm crimes, which can double a defendant’s guidelines range based on one “crime of violence” or triple or quadruple it based on two[4]); id. § 2S1.1 (the section for laundering crimes); id. § 7B1.1 (the section for probation and supervised release violations).
Since 2005, the Sentencing Guidelines are no longer mandatory, meaning that sentencing judges can now impose sentences above or below the sentence called for by the guidelines. Still, experience has shown us that sentencing judges rarely use their discretion to impose sentences up to the level called for by the career offender penalty (§ 4B1.1) when that penalty doesn’t apply.[5] Although I am sure he would prefer otherwise, Mr. Clayton’s case is a good example of the enormous impact §4B1.1 can have. Mr. Clayton received a § 4B1.1 sentence based on a 1994 Florida conviction. Back in 1994, the Florida court punished Mr. Clayton for this crime by giving him a sentence of probation and a $250 fine. When Mr. Clayton was sentenced in federal court sixteen years later, this same Florida conviction had a far more harsh effect. Without that 1994 crime, Mr. Clayton’s sentencing range would have been 120 to 150 months in prison. But because the 1994 conviction required that he be sentenced as a career offender, his sentencing range became 360 months to life. The judge sentenced Mr. Clayton to 360 months.
A.
In explaining why the Supreme Court’s holding in Johnson doesn’t apply to the guidelines, the Matchett panel looked to the Seventh Circuit’s ruling in United *1259 States v. Tichenor, 683 F.3d 358 (7th Cir. 2012). Quoting Tichenor, the panel said: “Since the Guidelines are merely advisory, defendants cannot rely on them to communicate the sentence that the district court will impose. Defendants’ inability to look to the Guidelines for notice underscores why ... they cannot bring vagueness challenges against the Guidelines.” 802 F.3d at 1194 (quoting Tichenor, 653 F.3d at 365). But this view of the guidelines is at odds with how the Supreme Court views them, and in any event, it is perilous to now deduce this principle from Tichenor. A year after Tichenor was decided, the Supreme Court applied the Ex Post Facto Clause to the Sentencing Guidelines. See Peugh v. United States, — U.S. -, 133 S.Ct. 2072, 186 L.Ed.2d 84 (2013). Like the vagueness doctrine, the Ex Post Facto Clause imposes a constitutional requirement of “fair notice.” Weaver v. Graham, 450 U.S. 24, 30, 101 S.Ct. 960, 965, 67 L.Ed.2d 17 (1981).
Even though the guidelines are now advisory, Peugh reminded us that they “remain the starting point for every sentencing calculation in the federal system.” 133 S.Ct. at 2083. In fact, “[18 U.S.C.] § 3553(a) explicitly directs sentencing courts to consider the Guidelines.” Gall v. United States, 552 U.S. 38, 50 n. 6, 128 5.Ct. 586, 596 n. 6, 169 L.Ed.2d 445 (2007). So while judges can choose sentences outside what the guidelines recommend, the Supreme Court has emphasized “the centrality of the Guidelines in the sentencing process.” Molina-Martinez v. United States, 578 U.S. -, 136 S.Ct. 1338, 1346, 194 L.Ed.2d 444 (2016). Molina-Martinez explained that the guidelines are “the starting point for the district court’s decision and anchor the court’s discretion in selecting an appropriate sentence.” Id. at 1349; see also id. at 1342 (“The Sentencing Guidelines provide the framework for the tens of thousands of federal sentencing proceedings that occur each year.”); Peugh, 133 S.Ct. at 2087 (“District courts must begin their sentencing analysis with the Guidelines ... and use them to calculate the sentencing range correctly; and those Guidelines will anchor both the district court’s discretion and the appellate review process.”).[6]
The guidelines have this “anchor” effect even when judges depart from them. “Even if the sentencing judge sees a reason to vary from the Guidelines, if the judge uses the sentencing range as the beginning point to explain the decision to deviate from it, then the Guidelines are in a real sense the basis for the sentence.” Peugh, 133 S.Ct. at 2083 (quotation omitted). “In less than one-fifth of cases since 2007 have district courts imposed above- or below-Guidelines sentences absent a Government motion. Moreover, the Sentencing Commission’s data indicate that when a Guidelines range moves up or down, offenders’ sentences move with it.” Id. at 2084 (citations omitted). Indeed a vague guideline can wreak harm on a defendant even before he is convicted of any crime. Id. at 2085 (plurality opinion) (“[A] defendant charged with an increased punishment for his crime is likely to feel en *1260 hanced pressure to plead guilty. This pressure does not disappear simply because the Guidelines range is advisory; the defendant will be aware that the range is intended to, and usually does, exert controlling influence on the sentence that the court will impose.” (citation omitted)).[7]
Peugh outright rejected the idea the Matchett panel relied on — that the guidelines need not give notice because they are “purely advisory.” Id. at 2087 (majority opinion). The Court wrote: “[i]t is simply not the case that the Sentencing Guidelines are merely a volume that the district court reads with academic interest in the course of sentencing.” Id. Rather, the guidelines are “the Federal Government’s authoritative view of the appropriate sentences for specific crimes.” Id. at 2085 (plurality opinion). And they announce “the most recent views of the agency charged by Congress with developing sentencing policy.” Id. at 2087 (majority opinion). For these reasons the guidelines must “give fan- warning of their effect and permit individuals to rely on their meaning.” Miller v. Florida, 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987) (quotation omitted) (applying the Ex Post Facto Clause to Florida’s advisory sentencing guidelines); see also Peugh, 133 S.Ct. at 2085 (plurality opinion) (“The [Ex Post Facto] Clause ensures that individuals have fair warning of applicable laws.”).
Like the Ex Post Facto Clause, the vagueness doctrine must also apply to the Sentencing Guidelines. Just as the Ex Post Facto Clause ensures “fair warning,” the vagueness doctrine says no law can be “so vague that it fails to give ordinary people fair notice of the conduct it punishes.” Johnson, 135 S.Ct. at 2556. The Matchett panel said Johnson does not apply because “advisory guidelines that inform a sentencing judge’s discretion [ ] cannot violate the notice requirement.” 802 F.3d at 1195. Peugh tells us the opposite. Even if Peugh doesn’t set out exactly when the vagueness doctrine applies, it shows that the panel’s “notice is irrelevant” argument is not enough to shield the guidelines from constitutional scrutiny. And “notice is irrelevant” is the best defense the panel gave for its ruling.
The panel’s idea that notice is irrelevant for the Sentencing Guidelines seems to be based on its misreading of Irizarry v. United States, 553 U.S. 708, 128 S.Ct. 2198, 171 L.Ed.2d 28 (2008). Irizarry held that Rule 32 of the Federal Rules of Criminal Procedure does not require a judge to say in advance of the sentence hearing what sentence she may impose. Id. at 709, 128 S.Ct. at 2200. In contrast, neither Peugh nor Johnson has anything to do with what a judge must say in any single case. Peugh and Johnson tackle the larger question of what notice is due the entire public about what punishment can be expected for a given offense. This notice is required from the “sentencing process long before the district court imposes the sentence.” Molina-Martinez, 136 S.Ct. at 1342. That’s why Peugh says that the Guidelines must give notice of what conduct the courts will punish, even if a particular judge is not required to give advance warning about how she will use her discretion in a given case.
The Matchett opinion ignores these lessons from Peugh and Molina-Martinez. Worse, the Matchett panel relied on precedent those cases abrogated. For example, the panel purported to “join” the Sixth *1261 Circuit “insofar as we reject Matchett’s argument that advisory guidelines can be unconstitutionally vague.” 802 F.3d at 1196. As it happens, the Sixth Circuit has itself considered this same argument and held “that the rationale of Johnson applies equally to the residual clause of the Guidelines.” United States v. Pawlak, 822 F.3d 902, 910-11 (6th Cir.2016). The Matchett panel also twice quoted from United States v. Wivell, 893 F.2d 156 (8th Cir. 1990). The Eighth Circuit has recognized that “[t]he reasoning in Wivell that the guidelines cannot be unconstitutionally vague because they do not proscribe conduct is doubtful after Johnson.” United States v. Taylor, 803 F.3d 931, 933 (8th Cir. 2015) (per curiam). And the Seventh Circuit, whose Tichenor opinion the Matchett panel quoted four times, has “proceed[ed] on the assumption that the Supreme Court’s reasoning [in Johnson] applies to section 4B1.2.” Ramirez v. United States, 799 F.3d 845, 856 (7th Cir. 2015). Of the other courts cited by the panel, this leaves only the Fifth Circuit, which has also vacated § 4B1.2 sentences because of Johnson. See infra n. 1. The Eleventh Circuit is all alone on this.
B.
The Matchett panel got the Sentencing Guidelines wrong in this way. It got the vagueness doctrine wrong as well. It said “[t]he vagueness doctrine applies only to laws that prohibit conduct and fix punishments.” 802 F.3d at 1189. I say federal policy that causes certain conduct to be punished by more years in jail “prohibits] conduct and fix[es] punishments.” But even if I am wrong on this, we know that the Supreme Court has long applied the vagueness doctrine to all kinds of things that don’t “prohibit conduct and fix punishments.” For example, a half century ago Giaccio v. State of Pennsylvania, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966), held unconstitutionally vague a statute that allowed juries to make acquitted defendants pay court costs “without any legally fixed standards.” Id. at 403, 86 S.Ct. at 521. The Supreme Court distinguished the statute, which after all applied only to those acquitted, from laws that “impose[ ] forfeitures, punishments or judgments for costs.” Id. at 404, at 86 S.Ct. at 522. This Pennsylvania statute neither prohibited conduct nor fixed punishment, but it was nonetheless unconstitutionally vague.
The panel’s reasoning also defies Johnson itself. Johnson reminded us of two ways in which vague laws can violate the Fifth Amendment’s guarantee of due process of law: “Our cases establish that the Government violates this guarantee by taking away someone’s life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement.” 135 S.Ct. at 2556. The Supreme Court then held that the 13 words of ACCA’s “residual clause” were unlawful in both these ways: “We are convinced that the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges.” Id. at 2557.
The Matchett panel gave no heed to these admonitions against “arbitrary enforcement.” Zero. Instead, the panel addressed only Johnson’s “notice” rationale, without ever mentioning the Court’s concern about “arbitrary enforcement by judges.” This matters because we have been instructed that the “arbitrary enforcement” concern is “the more important aspect of vagueness doctrine.” Kolender v. Lawson, 461 U.S. 352, 358, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). Perhaps reflecting this lesson, every time Johnson told us why the residual clause is not lawful, it underscored the problem that the *1262 vague language of the clause led different judges to give similarly situated defendants widely varying sentences.[8] But again, the panel made no effort to address this concern about arbitrariness, which the Supreme Court told us is “the more important aspect of vagueness doctrine.”
If the panel had been willing to evaluate how the residual clause in the Sentencing Guidelines leads to “arbitrary enforcement by judges,” then the case would have easily resolved in Mr. Matchett’s favor. The Supreme Court has told us that overly vague laws violate our Constitution because they “delegate[] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.” Grayned v. City of Rockford, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972). Or as Johnson put it, “the indeterminacy of the wide-ranging inquiry required by the residual clause” makes the clause unconstitutional because it “invites arbitrary enforcement by judges.” 135 S.Ct. at 2557.
The risks of “discriminatory application” and “arbitrary enforcement” here should be obvious. Two judges who are sentencing defendants with identical records can arrive at different sentences based on each judge’s personal sense of what seems like a crime of violence. Judges will certainly try to apply pre-Johnson residual clause opinions correctly when sentencing a person under USSG § 4B1.2.[9] But Justice Sca-lia once said that he worried that, in the end, judges will have little choice but to “simply throw the opinions into the air in frustration, and give free rein to their own feelings as to what offenses should be considered crimes of violence.” Derby v. United States, 564 U.S. 1047, 131 S.Ct. 2858, 2859, 180 L.Ed.2d 904 (2011) (Scalia, J., dissenting from denial of certiorari). Of course we expect that judges will not act so ignobly. But “the due process protection against vague regulations does not leave the public at the mercy of noblesse oblige.” FCC v. Fox Television Stations, Inc., — U.S. -, 132 S.Ct. 2307, 2318, 183 L.Ed.2d 234 (2012) (quotation omitted). Instead it bans any regulation that is “so standardless that it authorizes or encourages seriously discriminatory' enforcement.” United States v. Williams, 553 U.S. 285, 304, 128 S.Ct. 1830, 1845, 170 L.Ed.2d 650 (2008).
C.
Also worrisome, the Matchett panel opinion forces this court and all courts sentencing human beings within the Eleventh Circuit to continue to apply and even add to the body of law that Johnson discredited. The panel recognizes that Johnson “abrogated the previous decisions of *1263 the Supreme Court interpreting the residual clause.” 802 F.3d at 1195. But the panel nevertheless instructs courts that they “must still adhere to the reasoning of [these] cases” when interpreting § 4B1.2. Id. at 1195-96. Our court will thus continue to apply cases the Supreme Court derided as “anything but evenhanded, predictable, or consistent.” Johnson, 135 S.Ct. at 2563. Indeed Johnson referenced several § 4B1.2 cases to illustrate how the residual clause “produces more unpredictability and arbitrariness than the Due Process Clause tolerates.” 135 S.Ct. at 2558. The Supreme Court even gave this court an unwanted tip of the hat, when it cited one of our §4B1.2 opinions to declare that “[t]his Court is not the only one that has had trouble making sense of the residual clause.” Id. at 2559-60 (quotation omitted) (citing United States v. Whitson, 597 F.3d 1218 (11th Cir. 2010)). By my reading, the Supreme Court treated the problem with the residual clause in the statute as identical to the problem with the residual clause in the Sentencing Guidelines.[10]
Related to that point, the panel warned that applying the vagueness doctrine “would upend our sentencing regime” since “many [guidelines] provisions could be described as vague.” Id. at 1196. But the sky is not really falling. Johnson does not invalidate everything that “could be described as vague.” The Court singled out a far more distinct problem: laws that require judges to apply overly vague standards “to a judicially imagined ‘ordinary case’ of a crime, not to real-world facts.” 135 S.Ct. at 2557; see also id. at 2558 (“It is one thing to apply an imprecise “serious potential risk” standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction.”). In contrast, the guidelines base punishment almost exclusively on a defendant’s actual conduct.[11] Consider the two provisions that the Matchett panel warned could next be deemed vague. See 802 F.3d at 1196. The first asks if the defendant used “sophisticated means” in committing the actual crime. USSG § 2B1.1(b)(10). The other asks if she played a “minor” role in the actual crime. Id § 3B1.2(b). Johnson expressly condones standards that assess actual conduct in this way. See 135 S.Ct. at 2561 (“[W]e do not doubt the constitutionality of laws that call for the application of a qualitative standard such as ‘substantial risk’ to real-world conduct.”). I sincerely doubt that resentencing Mr. Matchett and others like him will “upend our sentencing regime.” Every other circuit has applied Johnson to the guidelines without any apparent trouble.
II.
The Matchett opinion is only one of many ways the Eleventh Circuit has uniquely “limited Johnson’s reach.” McCall, 826 F.3d at 1311, 2016 WL 3382006, at *2 (Martin, J., concurring). Today marks three months since the Su *1264 preme Court’s April 18 decision in Welch v. United States, — U.S. —, 136 S.Ct. 1257, 194 L.Ed.2d 387 (2016). In those three months, the Eleventh Circuit has ruled on over 1,159 applications for permission to file a successive § 2255 motion based on Johnson. These cases typically come to us as “nothing more than a form filled out by a prisoner.” McCall, — F.3d at 1311, 2016 WL 3382006, at *2 (Martin, J., concurring). Because we have so little to go on, “our court has been calling up each prisoner’s record” to decide, as though we ourselves are resentencing the prisoner, whether his record would qualify him for an ACCA sentence based on the parts of the statute that Johnson left intact. Id. Having been a part of this process, I can now count at least five ways that this “massive effort to decide the merits of hundreds of habeas cases within 30 days each, .all over a span of just a few weeks ... sets our court apart.” Id. at *3.
First, “[w]e were in the minority of courts that, from the beginning, said prisoners could not benefit from Johnson if they had already filed an earlier §2255 motion.” Id, That ruling “denied the application of Johnson to potentially hundreds of people based on pro se pleadings and without oral argument or briefing.” In re Franks, 815 F.3d 1281, 1289 (11th Cir. 2016) (Martin, J., dissenting). The government (who, after all, jailed these prisoners in the first place) disagreed with our ruling and “respectfully urge[d] the Court to convene en banc to decide this important issue.” Id. at 1289 n. 1.
Second, even after the Welch decision (remarkably issued only nineteen days after the case was argued) abrogated our precedent, prisoners faced another obstacle. Only two months remained until the one-year limitations period for making Johnson claims ran out. In the Eleventh Circuit, over a hundred prisoners tried to file Johnson applications before the Supreme Court decided Welch, most of them in the three months between the Welch certiorari grant and the day Welch was decided. See In re Robinson, 822 F.3d 1196, 1198-1201 (11th Cir.2016) (Martin, J., concurring) (listing 110 cases and dates). But “unlike all other circuits, the Eleventh Circuit refused to stay applications for successive § 2255 motions pending Welch.”[12] A month before the Welch decision, the full Eleventh Circuit refused to vacate the case that Welch eventually abrogated. See In re Rivero, 797 F.3d 986 (2016). A few days later, the full court also vacated a panel opinion that allowed the court to stay Johnson applications “until the Supreme Court decides Welch.” In re Johnson, 810 F.3d 1247, 1253 (11th Cir. 2016). If either of those votes had gone the other way, hundreds of prisoners would have had more time to file their cases, and the judges of this court would have had more time to evaluate them. Instead, inmates had to re-file their applications, and this court had to decide the same cases again, this time in a crush of hundreds of new Johnson cases. Other courts took steps to avoid this problem.
Third, “I am aware of no order from another court of appeals that combs through an applicant’s presentence investigation report to decide the merits of his yet-unfiled motion without ever hearing from a lawyer.” McCall, 826 F.3d at 1312 n. 7, 2016 WL 3382006, at *3 n.7 (Martin, J., concurring). A court of appeals is simply not equipped to construct a new basis for a prisoner’s old sentence in this way. At the district court sentence hearing, un *1265 like the pure paper review we are doing here, defense lawyers can point out factual errors in the PSI and otherwise educate the court about why the recommendations in the PSI might not be appropriate. None of that protection exists when prisoners apply to our court for permission to go to the district court to have their sentences reexamined.[13] Also, when deciding these cases, our court has over and over again failed to apply the Supreme Court’s current interpretation of ACCA.[14] This appears to set us apart from our peers too.
Fourth, as far as I know, ours is the only court to force a decision on every one of these cases within 30 days of filing. We do this based on 28 U.S.C. § 2244(b)(3)(D), which says: “The court of appeals shall grant or deny the authorization to file a second or successive application not later than 30 days after the filing of the motion.” Of course we never take lightly the word “shall” in a statute. But others who have considered this statute have concluded that “failure to comply with the thirty-day provision does not deprive this Court of the power to grant or deny a motion under § 2244(b)(3)(A)” because “the provision is hortatory or advisory rather than mandatory.” In re Siggers, 132 F.3d 333, 336 (6th Cir. 1997); see also In re Johnson, 810 F.3d 1247, 1249 (11th Cir. 2016) (“This Court has never decided if this 30-day timeframe is mandatory. All seven of the Courts of Appeals that have decided this question in a published opinion have said it is not.”). The Ninth Circuit recently observed about its experience deciding Johnson applications: “Given the large volume of second or successive applications our court must process each month, it frequently takes us longer — sometimes much longer — than 30 days to rule.” Orona v. United States, 826 F.3d 1196, 1199, 2016 WL 3435692, at *2 (9th Cir. June 22, 2016). I can’t help but think that if this court had taken the approach taken by others, our *1266 work on these cases would be both less frantic and more accurate.
Fifth, another panel of this court recently held that “the federal habeas statute requires us to dismiss a claim that has been presented in a prior application” to file a § 2255 motion. In re Baptiste, 828 F.3d 1337, 1339, 2016 WL 3752118, at *2 (11th Cir. July 13, 2016). Baptiste was construing another provision of AEDPA, that is 28 U.S.C. § 2244(b)(1), which says any “claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.” Of course, the § 2255 motions that I am talking about in this dissent are filed by federal prisoners. § 2255 motions are certainly not brought “under section 2254,” which governs petitions filed by state prisoners. But the Baptiste panel ruled that even though § 2244(b)(1) does not mention § 2255 motions, it applies to them anyway, since “it would be odd [ ] if Congress had intended to allow federal prisoners” to do something state prisoners can’t do. Id.[15] The panel thus held that the court must deny “leave to file a second or successive § 2255 motion presenting the same claims we have already rejected on their merits in a previous application.” Id. We have, of course, yet to see the full effect of Baptiste, but I hope it doesn’t work to bar relief for prisoners who ask us to look at their case again if we got it dead wrong the first time.
On the topic of this court’s singular approach, I add one more observation. Last month the Supreme Court granted certio-rari in the case of a Texas prisoner named Duane Buck. See Buck v. Stephens, No. 15-8049, — U.S. —, 136 S.Ct. 2409, 195 L.Ed.2d 779, 2016 WL 531661 (U.S. June 6, 2016). The Court took the case even though the lower court ruled that Mr. Buck’s appeal was so meritless that he couldn’t even file it. Mr. Buck’s petition for certiorari asked: “did the United States Court of Appeals for the Fifth Circuit impose an improper and unduly burdensome Certificate of Appealability (COA) standard?” Our treatment of applications for successive § 2255 motions may be even more troubling than the issue raised in Buck. Unlike for the denial of a COA, AEDPA provides that “denial of an authorization ... to file a second or successive application shall not be appealable and shall not be the subject of a petition for rehearing or for a writ of certiorari.” 28 U.S.C. § 2244(b)(3)(E). This means no motion for reconsideration, no motion for en banc review, no appeal, and no petition for certiorari. The decisions we make in these cases are therefore, as a practical matter, not reviewable.[16]
*1267 A month after AEDPA became law, the Supreme Court held that these “new restrictions on successive petitions ... do not amount to a ‘suspension’ of the writ.” Felker v. Turpin, 518 U.S. 651, 664, 116 S.Ct. 2833, 2340, 135 L.Ed.2d 827 (1996). Three Justices filed a concurrence warning that “the question whether the statute exceeded Congress’s Exceptions Clause power” might need to be revisited “if the courts of appeals adopted divergent interpretations of the gatekeeper standard.” Id. at 667, 116 S.Ct. at 2342 (Souter, J., concurring). I hope someone better equipped than me will take this opportunity to look at whether the divergent views taken by this court require reexamination of this question asked by these Justices so soon after AEDPA was enacted. Twenty years later, I worry that our court’s harsh view of our § 2244(b) gatekeeping role brings us perilously close to a suspension of the writ.

. See United States v. Soto-Rivera, 811 F.3d 53 (1st Cir. 2016); United States v. Welch, 641 Fed.Appx. 37, 2016 WL 536656 (2d Cir. Feb. 11, 2016); United States v. Townsend, 638 Fed.Appx. 172 (3d Cir.2015); United States v. Frazier, 621 Fed.Appx. 166 (4th Cir. 2015); Order, United States v. Estrada, No. 15-40264 (5th Cir. Oct. 27, 2015); United States v. Pawlak, 822 F.3d 902 (6th Cir.2016); Ramirez v. United States, 799 F.3d 845 (7th Cir. 2015); United States v. Taylor, 803 F.3d 931 (8th Cir. 2015); United States v. Benavides, 617 Fed.Appx. 790 (9th Cir. 2015); United States v. Madrid, 805 F.3d 1204 (10th Cir. 2015); Order, In re Booker, No. 16-3018 (D.C.Cir. June 10, 2016).

. See Beckles v. United States, No. 15-8544, - U.S. -, 136 S.Ct. 2510, - L.Ed.2d -, 2016 WL 1029080 (U.S. June 27, 2016). In that regard, I note that our court has expanded the ruling in Matchett. While Matchett ruled in a case for which the inmate was sentenced under the advisory guidelines, our court relied on Matchett to hold that prisoners can’t even make “a prima facie showing” that Johnson applies to the pre-Booker mandatory guidelines. See In re Griffin, 823 F.3d 1350, 2016 WL 3002293 (11th Cir. May 25, 2016). Three of my colleagues have explained in detail "why [they] believe Griffin is deeply flawed and wrongly decided” even if Matchett is correct. In re Sapp, No. 16-13338-J, 827 F.3d 1334, 1337, 2016 WL 3648334, at *3 (11th Cir. July 7, 2016) (Jordan, Rosenbaum, and Jill Pryor, J.J., concurring). I share their view. I add that Travis Beckles was sentenced after Booker, which means the Supreme Court’s ruling in his case *1257 might not address the mandatory guidelines issue the Eleventh Circuit decided in Griffin.

. See http://www.ussc.gov/sites/default/files/ pdi/research-and-publications/quick-facts/ Quick_F acts_Career_Offender_FY 14 .pdf. In over 90 percent of these cases, §4B1.1 “increased the guideline range.” Id. Also, two of the top five districts for § 4B1.1 sentences are in the Eleventh Circuit. See id. This is the latest data published by the Sentencing Commission.

. For example, a defendant convicted of being a felon in possession of a firearm who has two felony convictions from earlier in his life normally gets a sentencing range of 15 to 21 months. See id. § 2K2.1(a)(7). If just one of those convictions meets the definition that Johnson said was "nearly impossible to apply consistently,” 135 S.Ct. at 2560, the range becomes 41 to 51 months. See USSG § 2K2.1(a)(4)(A). If both meet that definition, it becomes 63 to 78 months. See id. § 2K2.1(a)(2). This fourfold increase is automatic even if the earlier convictions were themselves punished with as little as a year in state prison. See ich § 4B1.2(a).
USSG § 2K2.1 may affect more people than the career offender guideline. The Sentencing Commission’s most recent published data shows that "[i]n fiscal year 2014, there were 5,498 offenders convicted under 18 U.S.C. § 922(g), accounting for 7.2% of all offenders sentenced under the guidelines.” See http:// www.ussc.gov/sites/default/files/pdf/research- and-publications/quick-facts/Quick_Facts_ Felon_in_Possession_FY14.pdf. "For each of the past five years, more than half of offenders convicted of violating 18 U.S.C. § 922(g) were sentenced within the [guidelines] range.” Id. And as with §4B1.1, two of the top five districts for § 922(g) cases are in the Eleventh Circuit. See id. And that’s just § 922(g). USSG § 2K2.1 is also used to calculate sentences for violations of 18 U.S.C. §§ 922(a)-(p), (r)-(w), (x)(l), 923, 924(a), (b), (e)-(i), (k)-(o), 2332g, as well as 26 U.S.C. §§ 5685, 5861(a)-(i), 5871. See USSG App. A.

. For drug offenders like Mr. Clayton, less than 0.57% percent of defendants sentenced without §4B1.1 get sentences as long as the lowest end of guideline range for defendants sentenced under § 4B1.1. See http://www.src-project.org/wp-content/uploads/2016/04/Data-Analyses-l.pdf.

. The concept of an "anchor” effect makes sense, If a judge is told a sentencing range, her sentence is likely to be weighted toward that range no matter how far she might be permitted to depart from it. See Timur Kuran & Cass R. Sunstein, Availability Cascades and Risk Regulation, 51 Stan. L. Rev. 683, 705 (1999) (explaining how a number that appears early in a decision-making process "serves as a perceptual ‘anchor’ " and distorts the ultimate decision even if the decision-maker has wide discretion); see also Stephanos Bibas & Susan Klein, The Sixth Amendment and Criminal Sentencing, 30 Cardozo L. Rev. 775, 779 (2008) (noting that the advisory federal guidelines “provide mental anchors, starting points that influence how judges think about cases and where they wind up”).

. Uncertainty about §4B1.2’s meaning also distorts plea bargaining in state courts, where ”[p]leas account for nearly 95% of all [felony] convictions.” Padilla v. Kentucky, 559 U.S. 356. 372 & n. 13, 130 S.Ct. 1473. 1485 & n. 13, 176 L.Ed.2d 284 (2010). State defendants negotiating plea deals won’t likely know how their current conviction will impact a future § 4B1.2 sentence in federal court.

. See, e.g., 135 S.Ct. at 2558 ("[T]his Court's repeated attempts and repeated failures to craft a principled and objective standard out of the residual clause confirm its hopeless indeterminacy.”); id. at 2559-60 ("This Court is not the only one that has had trouble making sense of the residual clause. The clause has created numerous splits among the lower federal courts, where it has proved nearly impossible to apply consistently.” (quotation omitted)); id. at 2560 (“Nine years' experience trying to derive meaning from the residual clause convinces us that we have embarked upon a failed enterprise.”); id. at 2562 (“[T]he experience of the federal courts leaves no doubt about the unavoidable uncertainty and arbitrariness of adjudication under the residual clause.”); id. at 2563 ("Decisions under the residual clause have proved to be anything but evenhanded, predictable, or consistent.”).

. As detailed in the next section, even though these cases were overruled by Johnson, courts in the Eleventh Circuit are required to keep applying them. See Matchett, 802 F.3d at 1195-96 (“[S]entencing courts interpreting the residual clause of the guidelines must still adhere to the reasoning of cases interpreting the nearly identical language in [ACCA].”).

. Up until Matchett, this court also recognized that the two “residual clauses are identical” and treated them that way. United States v. Alexander, 609 F.3d 1250, 1253 (11th Cir. 2010). Most notably, we did so on the flip side of the exact issue decided in Matchett. See United States v. Chitwood, 676 F.3d 971, 978 n. 3 (11th Cir. 2012) (noting that the Supreme Court’s rejection of a vagueness challenge to ACCA’s residual clause "appears to foreclose” a vagueness challenge to § 4B1.2's residual clause).

. See United States v. Booker, 543 U.S. 220, 250, 125 S.Ct. 738, 759, 160 L.Ed.2d 621 (2005) (remedial opinion for the Court by Breyer, J.) ("Congress’ basic statutory goal — a system that diminishes sentencing disparity— depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction.”). For more on the "real conduct” focus of the Sentencing Guidelines, see Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest, 17 Hofstra L. Rev. 1, 12 (1988).

. Brief of the Federal Public and Community Defenders and the National Association of Federal Defenders as Amici Curiae in Support of Petitioner, at 4 n. 3, Jones v. United States, No. 15-8629 (U.S. April 21, 2016). I have not verified this claim, but I see no reason to doubt it.

. Prisoners filing applications in our court are confined to a short application form. This form, which can be seen at http://goo.gl/auE5 HQ, does not allow applicants to recreate for us what facts were ultimately found by the sentencing judge, or what legal decisions the judge made. Instead, it gives prisoners exactly two lines to "[sjtate concisely every ground on which you now claim that you are being held unlawfully.” And it warns: "Do not submit separate petitions, motions, briefs, arguments, etc.”

. This idea can be illustrated by this court’s treatment of the Supreme Court’s 2013 ruling in Descamps, which explained the proper method for evaluating a person’s prior convictions. This is, of course, the question that comes up for people whose sentences violate Johnson. But in rushing to rule on so many of these cases in such a short period, this court has been erratic about whether and when Descamps applies in this context. The court’s first published opinion on this issue held that Descamps did not apply to a Johnson claim because the sentencing judge had cited the Taylor case when imposing sentence. See In re Thomas, 823 F.3d 1345, 1347-49, 2016 WL 3000325, at *2 (11th Cir. May 25, 2016). Weeks later another panel held that Des-camps does apply when we can’t tell which ACCA definition the sentencing judge had in mind (two ACCA definitions are just halves of one statutory subsection, so judges most often made no distinction). See In re Adams, 825 F.3d 1283, 1285-86, 2016 WL 3269704, at *3 (11th Cir. June 15, 2016). Later that afternoon a third panel ruled that "Descamps cannot serve as a basis” for any Johnson claim. See In re Hires, 825 F.3d 1297, 1303, 2744, 2016 WL 3342668, at *5 (11th Cir. June 15, 2016). Two days later, a fourth panel tried to reconcile the “tension” in these cases. Rogers, 825 F.3d 1335, at 1339 n. 6, 2016 WL 3362057, at *2 n. 6. That same day another panel held that we can ignore Descamps even for prisoners sentenced after Descamps. See In re Cook, No. 16-12745 (11th Cir. June 17, 2016) (unpublished). Thomas, Adams, Hires, and Rogers are all published opinions, which means they set binding precedent. All of this precedent was established in a very short time period without any of the deliberation or adversarial presentation that goes into a normal appeal, and I'm afraid it shows.

. There is nothing “odd” at all about giving different review to prisoners who are contesting convictions imposed by states in state courts compared to prisoners challenging sentences we ourselves imposed in federal court. Comity requires the federal government to respect and defer to the processes put in place by state governments as well as the judgments of their courts. And anyway, state courts are able to fix their own mistakes. Federal courts imposed the sentences of prisoners in federal prisons, so those prisoners must look to us to fix our mistakes. Congress has long developed different standards for people challenging sentences imposed by state courts than for those challenging sentences imposed in federal court.

. This problem isn’t' limited to Johnson claims. Our court recently denied a Johnson application based on the “concurrent sentence doctrine," which treats an illegal sentence as “harmless” if a prisoner is serving another sentence that is just as long as the illegal one. In re Williams, 826 F.3d 1351, 1357, 2016 WL 3460899, at *5 (11th Cir. June 24, 2016). The Supreme Court has long warned that this doctrine is nothing more than a "rule of judicial convenience.” Benton v. Maryland, 395 U.S. 784, 791, 89 S.Ct. 2056, 2061, 23 L.Ed.2d 707 (1969). And our court had never before "applied harmless error or the concurrent sentence doctrine in the context of an application to file a second or successive §2255 motion.” Williams, 826 *1267 F.3d at 1357, 2016 WL 3460899, at *5. Without any briefing or advocacy on the question, Williams held that this doctrine barred a prisoner from even filing his § 2255 motion. Days later, a split panel used Williams to deny a pro se application for permission to file a § 2255 motion based on Miller v. Alabama, 567 U.S. -, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012). See In re Hernandez-Miranda, No. 16-12893 (11th Cir. June 28, 2016) (unpublished). Mr. Hernandez-Miranda was "a juvenile when he joined a conspiracy for which he was later sentenced to life without • parole.” Id. at 13 (Martin, J., dissenting). Because of the restrictions on review of our rulings in this context, the panel’s order was the beginning and end of Mr. Hernandez-Miranda’s Eighth Amendment claim.